SEGGERMAN NIXON CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 31300.    Filed May 31, 1956.

*Peter Guy Evans,* Esq., and *Charles M. Hecht,* C. P. A., for the petitioner.

*Martin D. Cohen,* Esq., and *Arthur N. Mindling,* Esq., for the respondent.

OPINION.

Tietjens, *Judge:* The petitioner asks for relief pursuant to section 722 (a) and subparagraphs (2), (4), and (5) of section 722 (b), Internal Revenue Code of 1939,[1] from allegedly excessive and dis-

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average

criminatory excess profits taxes for fiscal years ended in 1944, 1945, and 1946.

The petitioner computed its excess profits credit under the average earnings method. In order to qualify for relief under section 722 the petitioner must show that its average base period net income is an inadequate standard of normal earnings because of one or more of the factors specified in section 722 (b) and to establish what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income. The terms "standard of normal earnings" and "fair and just amount representing normal earnings" are regarded as synonymous. See E. P. C. 16, 1947–1 C. B. 90. The petitioner's average base period net income as computed under section 713 (f) is $96,921.63. Unless the petitioner shows that it qualifies for relief because of one or more of the factors specified in section 722 (b) and also can establish a fair and just amount representing normal earnings in excess of this figure, its average base period net income is not an inadequate standard of normal earnings and it is not entitled to relief. In our opinion the petitioner has not carried its burden of proof in either respect and accordingly has not qualified for relief under section 722.

---

base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the contructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\*     \*     \*     \*     \*     \*     \*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry.

\*     \*     \*     \*     \*     \*     \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, \* \* \*

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

The arithmetical average of petitioner's base period net income was $66,460.22 and the best base period year prior to the last year had excess profits net income of $69,902.84. The average base period net income as computed under section 713(f) is equal to the amount of the petitioner's excess profits net income for the last base period year.

The petitioner contends that certain changes in the character of its business occurred during or immediately prior to the base period which affected its earnings and that its business did not reach by the end of the base period the earning level it would have reached had the changes been made 2 years earlier. Also, it contends that its earnings in the last base period year were depressed because of a price war. The petitioner proposes several constructive average base period net incomes ranging from $155,824 to $359,300.

Prior to December 1933 petitioner's business was operating as manufacturer's agent and grocery broker. The petitioner secured licenses and acted as importers' agent and direct importer selling imported liquors and wines to some 30 liquor wholesalers in New York City after December 1933 and to others in Connecticut and New Jersey late in 1934. Petitioner argues that this constitutes commencement of this business immediately prior to the base period and says that the formative stage had not been fully completed by the beginning of the base period, citing *Midwest Liquor Dealers, Inc.*, 20 T. C. 950, 964.

Petitioner also contends that it changed the character of its business in the metropolitan area in 1935 by becoming a liquor wholesaler. Prior thereto it was acting as an importer and importers' agent selling to some 30 wholesalers in that area. After this change petitioner sold to retail dealers in the area and had some 14,000 potential customers, all the licensed retail dealers. The petitioner thereafter required larger forces for sales, handling stock, and trucking and had to find new and larger sources of supply.

Petitioner further contends that it changed the character of its business during the base period by increasing its capital, resulting in an increase in its borrowing power and thus in its capacity for operation. In July 1937, $123,000 was transfered from the surplus account to preferred stock and 1,230 shares of preferred stock were issued. Additional units of preferred and common stock were issued for $84,700. During the base period the net worth of petitioner increased from about $100,000 to about $350,000. The increase in capitalization enabled petitioner to increase its borrowings from banks. These were $50,000 at the commencement of the base period, increased to a maximum of $300,000, and amounted to $250,000 at the end of such period. The increase in available funds permitted petitioner to increase its inventory both as to volume and number of items, resulting in greater turnover and increased profits.

It is also contended that the petitioner changed the character of its business in 1937 by acquiring distributorships from several large distributors including National Distillers and Brown-Forman Distillers Corporation.

Petitioner was operating as a manufacturer's agent and broker in the grocery business and had a functioning distributing organization prior to 1934. In entering the liquor business it used this distributing organization and was not under the necessity of creating one. This factor distinguishes *Midwest Liquor Dealers, Inc., supra,* cited by the petitioner, where the taxpayer was not organized until 1935. There was no problem of selling liquor in the early years after repeal of prohibition, the sole difficulty lay in procuring the merchandise to sell. Petitioner apparently achieved a level of earnings almost at once which may be regarded as normal for its then available capital and resources. Its ratio of net income to year-end net worth was not increased after the first base period year. See *Harlan Bourbon & Wine Co.,* 14 T. C. 97 (1950). We cannot say that petitioner has proved that its entry into the liquor business occurred immediately prior to the base period within the meaning of the statute, and that on that account petitioner did not achieve a normal level of earnings during the base period. See *Monarch Cap Screw & Manufacturing Co.,* 5 T. C. 1220, 1231 (1945) (change made in 1934) ; *Acme Breweries,* 14 T. C. 1034, 1055 (1950) (change in 1933) ; *A. B. Frank Co.,* 19 T. C. 174, 181 (1952) (change in 1933) ; *West Flagler Amusement Co.,* 21 T. C. 486 (1954) (change on October 1, 1933).

Nor do we regard the evidence as showing that petitioner changed the character of its business in 1935 by becoming a liquor wholesaler. Its first operations embraced sales to wholesalers and to retail outlets and it was licensed to deal at both of these levels. Apparently it proved to be more profitable for the petitioner to concentrate on sales to retail dealers and to reduce or abandon its sales to wholesalers. We think this did not amount to a change in the character of the business within the purport of the statute. Although petitioner says that it had to adopt new methods in marketing, delivery, and distribution and administration, these have not been described and there is no showing of the nature or extent of these changes or their effect upon earnings.

The acquisition by the petitioner of distributorships for National Distillers and Brown-Forman in 1937 did not amount to a change in the character of the business. It appears that the practice of the petitioner was to acquire new distributorships from time to time and drop them if they proved unprofitable. The Brown-Forman distributorship was terminated when the distiller formed its own distributing organization. The National Distillers' brands proved unprofitable

because of an attempt to market various blended whiskeys. It has not been shown that a higher level of earnings resulted from these distributorships. Nor can this be said to mark a new method of doing business.

It has not been shown that the foregoing changes had any material effect upon the petitioner's level of earnings.

There has been no showing of the extent of the economies, if any, effected by the change in business location in 1938. We are unable to say that this change would materially have affected the petitioner's earnings had it occurred 2 years earlier.

The increase in capitalization effected in 1937 and 1938 apparently enabled the petitioner to enlarge its inventory, increase its sales, and achieve a somewhat higher level of earnings. The earnings level of the fiscal years ended in 1937 and 1938 averaged about $50,000. In the next fiscal year this was increased to about $70,000, and the increase may well have been due to the increased capital of the corporation. In the last base period year the income was affected by other factors. Even if the increase in earnings to approximately $97,000 in that year may be regarded as due to this change in the character of the business, we do not consider this as proving that 2 more years of operation would have enabled the petitioner to reach a level of earnings considerably greater than that. And because of the other factors affecting the earnings of that year we are unable to accept the conclusion that the increase in earnings in such year was primarily due to the increase in capitalization. While the added capital may have enabled the petitioner to take advantage of an opportunity for exceptional profits, it did not cause those profits. See *Green Spring Dairy, Inc.*, 18 T. C. 217.

Two other factors substantially affected the earnings of petitioner's last base period year, one tending to reduce, the other to augment, these earnings. The petitioner argues that its earnings for such year were greatly depressed by a price war affecting its business in its Metropolitan division and forcing the granting of excessive discounts and allowances to its customers. These amounted to $91,150.05 or about 5 per cent of the gross sales of that division. In the New Jersey and Connecticut divisions the petitioner did not find it necessary to grant discounts or allowances. The argument is made that the price war was a temporary economic circumstance depressing the petitioner's business and was a qualifying factor for relief under section 722 (b) (2) and that if petitioner had not been under the necessity of granting such discounts its profits for that fiscal year would be larger by the amount of such discounts.

We think the evidence is not sufficient to establish that the reduced level of earnings of the petitioner's Metropolitan division was due to

a temporary and unusual economic circumstance within the meaning of section 722 (b) (2). In *Harlan Bourbon & Wine Co., supra,* we pointed out (pp. 104–6) the nature of the competition which developed in the newly revived liquor industry in the base period when many concerns sought to enter the field. We concluded from the evidence there presented that keen competition must be considered normal in the liquor industry. Here, the petitioner has not shown that the competition resulted in severe losses or sales below cost in the base period, an essential characteristic of a price war. Nor is it shown that petitioner and other members of the industry suffered severe losses or that a substantial number of wholesalers were eliminated and were unable to stay in business. In fact the petitioner still had some profits and increased the salaries of its officers in these years. This last circumstance tends to deny that the business was depressed by the existence of a price war. *Blaisdell Pencil Co.,* 16 T. C. 1469, 1481–2 (1951). The testimony was to the effect that the condition became serious in 1940 and that price cutting occurred because inventories had become over large. Production had exceeded consumption for several years and reduction in prices necessarily followed with resultant reduction in profits. It was an ordinary and permanent economic situation in the liquor industry; not a temporary and unusual economic event. See *Empire Liquor Corporation,* 25 T. C. 1183 (1956). In this state of keen competition the petitioner may not expect as large a percentage of profit as it had enjoyed before. Nor would these facts warrant the conclusion that the entire amount of discounts should be added back to income in a reconstruction of normal income. The sales level achieved in the year was reached only by granting these discounts. An assumed normal percentage of profit should not be applied to such sales in a reconstruction of normal earnings. Thus while the keen competition may have depressed the petitioner's income in this year to some extent, it is not a basis for relief under section 722 and the method of reconstruction proposed by the petitioner to determine a normal level of earnings is unwarranted.

The other principal factor affecting the petitioner's earnings in the last base period fiscal year was the abnormally high level of sales and profits realized in the month of September 1939 as a result of war scare buying following the outbreak of war in Europe. Statistics show that there was a marked increase in imports in September 1939, imports of whiskey being 2½ times and brandy imports about 3 times those of September 1938. The petitioner borrowed $300,000 from its banks to finance its unusual volume of business at this time. Petitioner's profits for September 1939 amounted to $59,574.52. The next best month in petitioner's last 2 base period years was the follow-

ing month, October 1939, when profits amounted to $12,249.34. Profits for the entire calendar year 1939 were about $114,500 or an average of about $9,500 per month. For 11 months of 1939 excluding September they were about $55,000, or about $4,600 per month. The profits of September alone were greater than profits for the other 11 months in the calendar year 1939 or in the fiscal year ended in 1940. In view of this abnormal profit for 1 month we cannot regard the profits of nearly $97,000 for the fiscal year ended in 1940 as representative of normal growth in comparing them with the profits of the preceding fiscal years. The profits of September 1939 were war derived and were temporary. It would not be reasonable to regard them as a measure of normal earnings upon the basis of events or conditions existing on or prior to December 31, 1939. These profits should be adjusted substantially downward in measuring normal earnings.

The petitioner has not established that it qualifies for relief because of one or more of the factors specified in section 722 (b).

Additionally, the constructive average base period net incomes proposed by the petitioner are founded upon assumptions as to a further increase in sales and profits which we consider unwarranted from the record. We do not deem it necessary to discuss these computations in detail. Upon consideration of all the factors involved we are satisfied that the base period net income as computed under section 713 (f) is not an inadequate standard of normal earnings and that the petitioner is not entitled to relief under section 722.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*