NORTHWEST CASUALTY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 37122.   Filed December 30, 1957.

*Frederick J. Orth, Esq.,* and *Hoyt M. Wilbanks, Jr., Esq.,* for the petitioner.

*Aaron S. Resnick, Esq.,* for the respondent.

ATKINS, *Judge:* The respondent disallowed in full the petitioner's claims for relief from excess profits tax under section 722 of the Internal Revenue Code of 1939 for the calendar years 1942 and 1943. The petitioner seeks a refund of $131,412.30 for the year 1942 and $150,866.18 for the year 1943, representing the entire amounts of excess profits taxes paid for those years.

The petitioner claims that its average base period net income is an inadequate standard of normal earnings by reason of the existence of facts which bring it within the provisions of subsections (b) (4) and (b) (5) of section 722. Its contention under (b) (4) is that, because of the nature of its business, it did not achieve a normal level of earnings during the entire period 1928 to 1939, and that consequently it must be deemed to have commenced business immediately prior to the base period, entitling it to a constructive average base period net income. The contention under (b) (5) is that inaccuracies in the petitioner's loss reserves during the base period, as indicated by subsequent developments, produced an inadequate standard of normal earnings during that period.

### FINDINGS OF FACT.

Some of the facts were stipulated and are incorporated herein by this reference.

The petitioner was organized under the laws of the State of Washington as a stock casualty insurance corporation on April 27, 1928, and it commenced business at that time. For the years 1942 and 1943 it filed its income and excess profits tax returns with the collector of internal revenue at Tacoma, Washington. For the years 1936 through 1946 its tax returns were prepared on an accrual method of accounting as applicable to insurance companies other than life or mutual as provided for in the Internal Revenue Code of 1939 and earlier revenue acts.

During all of the years herein material the petitioner was the wholly owned subsidiary of the Northwestern Mutual Fire Association of Seattle, Washington, which was organized in 1901. At the time of the formation of the petitioner, the laws of Washington did not permit a fire insurance company to insure automobile or casualty hazards. For some years prior to 1928 Northwestern Mutual Fire Association had an agency arrangement with a casualty insurance company, through which it placed automobile and casualty insurance. There was a considerable volume of such business, particularly of automobile liability insurance. In order to handle casualty insurance, Northwestern Mutual Fire Association formed the petitioner, and upon formation transferred to it the renewals of casualty business that had theretofore been placed with another insurance company through the agency arrangement. The volume of insurance so transferred produced a business growth of the petitioner in excess of what a new insurance company could ordinarily attain.

From the time of the formation of the petitioner in 1928 and throughout all the years here involved, the parent company, under an operating agreement with the petitioner, furnished to the petitioner executive and administrative personnel and services and the use of

real and personal property owned or leased by the parent, for an agreed percentage of the petitioner's written premiums, less return premiums.

The percentage of premiums written by the petitioner which were charged by the parent as administration expenses, and the amounts of such expenses, were as follows:

| Year | Rate (per cent) | Administration expense | Year | Rate (per cent) | Administration expense |
|------|------|------|------|------|------|
| 1928 | 20 | $60, 440. 16 | 1937 | 37 | $510, 676. 26 |
| 1929 | 20 | 167, 235. 60 | 1938 | 37 | 553, 841. 80 |
| 1930 | 27. 5 | 121, 417. 84 | 1939 | 37 | 752, 624. 34 |
| 1931 | 30 | 130, 895. 81 | 1940 | 37 | 940, 648. 47 |
| 1932 | 35 | 190, 666. 37 | 1941 | 37 | 1, 113, 871. 50 |
| 1933 | 35 | 198, 371. 86 | 1942 | 40 | 1, 080, 069. 32 |
| 1934 | 35 | 288, 785. 71 | 1943 | 40 | 1, 029, 223. 90 |
| 1935 | 30 | 306, 634. 72 | 1944 | 40 | 1, 098, 989. 60 |
| 1936 | 37 | 423, 167. 39 | 1945 | 40 | 1, 318, 701. 13 |

Under the agreement between the petitioner and its parent, the parent assumed all production, underwriting, accounting, and management expenses other than taxes, licenses, and rating bureau fees. With a low administration expense factor, as resulted from the agreement between the two companies, the petitioner was in a more favorable position with respect to profits than an insurance company would be without such an affiliation.

The petitioner was originally licensed to write insurance in the State of Washington. It began business with a paid-in capital of $200,000 and a surplus of $100,000. In 1931 its capital was increased to $250,000 to permit it to write insurance in various other States, and in 1937 capital was increased to $400,000 to permit the writing of surety business. These increases in capital were paid in by the parent out of special cash dividends declared by the petitioner. By the end of the base period the petitioner was licensed to do business in about 15 Western, Midwestern, and Southwestern States and in the Canadian provinces of British Columbia, Ontario, and Manitoba. The principal business of the petitioner prior to and during the base period years, as well as during the years in question, consisted of motor vehicle insurance.

In the year 1935 the petitioner had 830 agents in the States and provinces in which it did business. In the base period years the number of agents and the percentage of the number of agents in relation to the number it had in 1935 were as follows:

| Year | Total No. | Per cent of 1935 |
|------|------|------|
| 1936 | 922 | 111. 1 |
| 1937 | 1, 052 | 126. 7 |
| 1938 | 1, 120 | 134. 9 |
| 1939 | 1, 315 | 158. 4 |

The number of petitioner's agents continued to increase during the years 1940 and 1941 at a rate and in numbers not now determinable.

In the casualty insurance business virtually all of the policies are of 1 year's duration. Casualty insurance companies are required by the laws of the various States and the various insurance commissions to submit an annual statement, commonly referred to as the "convention form," setting forth all items of income including investment income and underwriting income, expenses, and other statistical data. They are required to report their gross income for Federal income tax purposes on the basis of the underwriting and investment exhibit of such annual statement.[1] In the convention forms the companies are required to show as a liability the unearned premiums on any policies outstanding as of the end of the year. The unearned premiums are calculated on the full amount of the premiums written on all policies in force (less reinsurance) without reduction by the necessary expenses of operation such as agents' commissions, although those expenses are almost entirely incurred and paid at the time the policies are written. Furthermore, the companies are not permitted to defer deduction of those expenses in computing taxable income. In practice, the petitioner sets up, on all policies, 50 per cent of all premiums in force as a reserve for unearned premiums, as permitted by the law of the State of Washington.[2] The amount of this reserve is reflected on the convention form in the computation of net premiums earned in any year by adding to the net premiums written during the year the unearned premiums at the beginning of the year and subtracting the unearned premiums at the end of the year. In computing the underwriting income there is deducted the amount of losses, adjustment expenses, and underwriting expenses incurred.

Under this required method of reporting income, if there is a continuing substantial increase from year to year in the volume of premiums written, the resulting increase in the unearned premium liability, plus the losses and operating expenses, operates to reduce the underwriting income. In some instances the result shown may be a loss in underwriting income, requiring the insurance company to utilize investment income and contributed surplus to meet its ex-

---

[1] Sec. 204 (b), I. R. C. 1939, provides in part:

(b) DEFINITION OF INCOME, ETC.—In the case of an insurance company subject to the tax imposed by this section—

(1) GROSS INCOME.—"Gross income" means the sum of (A) the combined gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Convention of Insurance Commissioners, and (B) gain during the taxable year from the sale or other disposition of property, and (C) all other items constituting gross income under section 22; * * *

[2] Sec. 48.12.040, Wash. Rev. Code.

penses. Generally such result does not follow if the increase in volume of premiums written is not in excess of 5 or 10 per cent over that of the previous year. Thus, when the business is expanding and the amount of premiums written increases, the effect is to show lesser underwriting income. Conversely, if a company reaches a point where its yearly premiums written are fairly constant or if there is a decrease in the volume of premiums written the result is to show an increase in underwriting income due to the release, when earned, of amounts which have been previously carried as unearned premiums.

For these reasons, in the case of a new company which is growing rapidly, it may for a number of years show relatively little underwriting income or may show a loss in underwriting income, this condition prevailing until it reaches a so-called plateau at which it has achieved its place in the industry and its premiums level off to a fairly constant increase. Experience has shown that generally this leveling-off point is not reached before the tenth year of operations.

In the case of the petitioner, its net premiums written and its net premiums earned, computed as shown below, for the years 1928 to 1945, inclusive, were as follows:

| Year | Net premiums written | Added unearned at beginning | Deduct unearned at end [1] | Net premiums earned |
|------|---------------------|----------------------------|---------------------------|---------------------|
| 1928 | $294,154.34 | | $143,639.10 | $150,515.24 |
| 1929 | 816,696.66 | $143,639.10 | 409,569.38 | 550,766.38 |
| 1930 | 400,687.75 | 409,569.38 | 195,252.07 | 615,005.06 |
| 1931 | 398,083.15 | 195,252.07 | 196,906.69 | 396,428.53 |
| 1932 | 504,737.97 | 196,906.69 | 234,493.68 | 467,150.98 |
| 1933 | 528,213.41 | 234,493.68 | 259,746.92 | 502,960.17 |
| 1934 | 782,180.41 | 259,746.92 | 377,220.09 | 664,707.24 |
| 1935 | 990,216.34 | 377,220.09 | 486,672.50 | 880,763.93 |
| 1936 | 1,073,786.13 | 486,672.50 | 553,338.02 | 1,007,120.61 |
| 1937 | 1,315,641.15 | 553,338.02 | 664,684.59 | 1,204,294.58 |
| 1938 | 1,427,109.23 | 664,684.59 | 751,994.27 | 1,339,799.55 |
| 1939 | 1,943,142.25 | 751,994.27 | 1,021,756.20 | 1,673,380.32 |
| 1940 | 2,459,931.76 | 1,021,756.20 | 1.291,066.15 | 2,190,621.81 |
| 1941 | 2,915,167.12 | 1,291,066.15 | 1,522,571.94 | 2,683,661.33 |
| 1942 | 2,600,757.11 | 1,522,571.94 | 1,335,998.04 | 2,787,331.01 |
| 1943 | 2,497,604.48 | 1,335,998.04 | 1,257,327.32 | 2,576,275.20 |
| 1944 | 2,651,759.01 | 1,257,327.32 | 1,329,319.44 | 2,579,766.89 |
| 1945 | 3,194,108.81 | 1,329,319.44 | 1,601,031.65 | 2,922,396.60 |

[1] The amounts appearing in the above schedule in the column captioned "Deduct unearned at end" are the amounts of the petitioner's reserves for unearned premiums at December 31 of each of the years listed.

As shown in the above tabulation the unearned premium reserve as of the end of each of the years 1936, 1937, 1938, and 1939 represented an increase over the amount of such reserve at the close of each preceding year, while such reserve at the end of each of the taxable years 1942 and 1943 represented a decrease in the amount of the reserve at the close of each preceding year.

The amounts of the petitioner's net premiums earned, underwriting deductions, and underwriting results for the above years were as follows:

| Year | Net premiums earned | Underwriting deductions [1] | Underwriting results |
|---|---|---|---|
| 1928 | $150, 515. 24 | $135, 497. 51 | $15, 017. 73 |
| 1929 | 550, 766. 38 | 465, 608. 06 | 85, 158. 32 |
| 1930 | 615, 005. 06 | 389, 042. 81 | 225, 962. 25 |
| 1931 | 396, 428. 53 | 403, 502. 00 | (7, 073. 47) |
| 1932 | 467, 150. 98 | 455, 196. 09 | 11, 954. 89 |
| 1933 | 502, 960. 17 | 427, 128. 12 | 75, 832. 05 |
| 1934 | 664, 707. 24 | 632, 471. 79 | 32, 235. 45 |
| 1935 | 880, 763. 93 | 896, 191. 31 | (15, 427. 38) |
| 1936 | 1, 007, 120. 61 | 905, 362. 49 | 101, 758. 12 |
| 1937 | 1, 204, 294. 58 | 1, 152, 681. 88 | 51, 612. 70 |
| 1938 | 1, 339, 799. 55 | 1, 226, 450. 83 | 113, 348. 72 |
| 1939 | 1, 673, 380. 32 | 1, 595, 193. 53 | 78, 186. 79 |
| 1940 | 2, 190, 621. 81 | 2, 067, 876. 57 | 122, 745. 24 |
| 1941 | 2, 683, 661. 33 | 2, 591, 911. 90 | 91, 749. 43 |
| 1942 | 2, 787, 331. 03 | 2, 595, 773. 86 | 191, 557. 17 |
| 1943 | 2, 576, 275. 20 | 2, 027, 743. 32 | 548, 531. 88 |
| 1944 | 2, 579, 766. 89 | 2, 474, 204. 10 | 105, 562. 79 |
| 1945 | 2, 922, 396. 60 | 3, 045, 939. 85 | (123, 543. 25) |

[1] Consists of net losses incurred on a case basis, claims expenses incurred on a case basis, and underwriting expenses incurred.

Statistics as to the petitioner's total income, deductions, net income, and excess profits net income are:

| Year | Total income [1] | Deductions [2] | Net income | Excess profits net income [3] |
|---|---|---|---|---|
| 1928 | $153, 023. 18 | $144, 227. 38 | $8, 795. 80 | |
| 1929 | 562, 319. 84 | 546, 452. 86 | 15, 866. 98 | |
| 1930 | 626, 612. 54 | 606, 140. 94 | 20, 471. 60 | |
| 1931 | 400, 798. 26 | 371, 570. 22 | 29, 228. 04 | |
| 1932 | 471, 253. 00 | 452, 820. 68 | 18, 432. 32 | |
| 1933 | 505, 966. 70 | 467, 366. 80 | 38, 599. 90 | |
| 1934 | 668, 287. 23 | 617, 235. 05 | 51, 052. 18 | |
| 1935 | 890, 533. 96 | 882, 546. 46 | 7, 987. 50 | |
| 1936 | 1, 020, 225. 13 | 907, 781. 90 | 112, 443. 23 | $103, 404. 60 |
| 1937 | 1, 211, 372. 19 | 1, 155, 979. 25 | 55, 392. 94 | 52, 113. 96 |
| 1938 | 1, 345, 330. 48 | 1, 218, 416. 75 | 126, 913. 73 | 125, 473. 06 |
| 1939 | 1, 678, 280. 79 | 1, 587, 781. 89 | 90, 498. 90 | 92, 485. 68 |
| 1940 | 2, 195, 288. 32 | 2, 130, 917. 57 | 64, 370. 75 | 75, 380. 42 |
| 1941 | 2, 710, 322. 62 | 2, 564, 654. 77 | 145, 667. 85 | 129, 420. 46 |
| 1942 | 2, 820, 902. 56 | 2, 315, 797. 85 | 505, 104. 71 | 490, 631. 25 |
| 1943 | 2, 610, 481. 91 | 2, 038, 637. 27 | 571, 844. 64 | 558, 248. 09 |
| 1944 | 2, 618, 448. 20 | 2, 416, 271. 43 | 202, 176. 77 | 244, 482. 11 |
| 1945 | 2, 968, 811. 40 | 3, 126, 462. 75 | −157, 651. 35 | −106, 259. 61 |

[1] Includes net premiums earned, taxable investment income, and net gain from sale of ledger assets.
[2] Consists of losses and adjustment expenses incurred, underwriting and investment expenses incurred, "dividends" to policyholders, net loss from sale of ledger assets, loss on sale of depreciable assets, and conversion of Canadian funds.
[3] Reflects additions to net income for capital gains, interest on borrowed capital, tax-free interest, and deductions for net capital gain and interest subject to surtax. Does not reflect carrybacks of net operating losses.

Due to the fact that during the base period years the amount of premiums written was increasing, the ratio of petitioner's premiums written to its premiums earned was 110.2 per cent, whereas such ratio for the stock casualty companies generally was 102.3 per cent. In the case of each ratio the excess over 100 indicates growth.

The net premiums written by the petitioner on all classes of insurance during the years 1936, 1937, 1938, and 1939 represented 108.4 per cent, 132.9 per cent, 144.1 per cent, and 196.2 per cent, respectively, of net premiums written by the petitioner in the year 1935.

During the base period years the petitioner's premium written entries increased each year from 53,767 in 1936 to 95,130 in 1939,

and its premium cancellation entries increased each year from 13,048 in 1936 to 22,554 in 1939. "Premium written entries" consist of each policy written or renewed and each subsequent transaction by which one or more additions are made thereto. "Premium cancellation entries" consist of each cancellation of a policy and each transaction in which one or more parts of a policy are canceled.

The percentage that the petitioner's "premiums written" bore to the aggregate premiums of all casualty companies in the United States increased, with some exceptions, throughout the period 1930 through 1945, as shown by the following tabulation:

| Year | Petitioner's percentage | Year | Petitioner's percentage |
|---|---|---|---|
| 1930 | 0. 1007 | 1938 | 0. 3450 |
| 1931 | . 1049 | 1939 | . 4703 |
| 1932 | . 1597 | 1940 | . 5624 |
| 1933 | . 1687 | 1941 | . 5998 |
| 1934 | . 2377 | 1942 | . 5251 |
| 1935 | . 2834 | 1943 | . 5359 |
| 1936 | . 2806 | 1944 | . 5084 |
| 1937 | . 3112 | 1945 | . 5387 |

The petitioner's total admitted assets and its earned surplus at December 31 of each of the years 1928 to 1945, inclusive, were as follows:

| Year | Total admitted assets | Earned surplus | Year | Total admitted assets | Earned surplus |
|---|---|---|---|---|---|
| 1928 | $516, 917. 92 | $21, 281. 96 | 1937 | $1, 843, 185. 06 | $218, 498. 95 |
| 1929 | 928, 874. 03 | 29, 505. 71 | 1938 | 2, 069, 330. 71 | 249, 310. 98 |
| 1930 | 766, 677. 46 | 78, 126. 31 | 1939 | 2, 545, 373. 63 | 237, 413. 33 |
| 1931 | 791, 231. 86 | 67, 606. 93 | 1940 | 3, 101, 243. 02 | 287, 037. 21 |
| 1932 | 894, 092. 59 | 101, 031. 79 | 1941 | 3, 477, 063. 31 | 324, 977. 37 |
| 1933 | 1, 002, 370. 20 | 162, 417. 94 | 1942 | 3, 793, 951. 02 | 358, 701. 77 |
| 1934 | 1, 244, 226. 33 | 240, 560. 20 | 1943 | 4, 077, 499. 58 | 457, 646. 21 |
| 1935 | 1, 455, 451. 33 | 267, 698. 78 | 1944 | 4, 167, 697. 05 | 719, 452. 80 |
| 1936 | 1, 606, 747. 37 | 376, 214. 31 | 1945 | 4, 720, 012. 73 | 894, 103. 99 |

The petitioner's ratio of losses incurred, on a case basis, to net premiums earned in 4-year periods consisting of years immediately prior to the base period years, years in the base period, and the years immediately after the base period, and the average of each period, were as follows:

| Year | Ratio | Average |
|---|---|---|
| 1932 | 44. 32 | |
| 1933 | 38. 16 | 44. 46 |
| 1934 | 41. 36 | |
| 1935 | 54. 00 | |
| 1936 | 38. 16 | |
| 1937 | 41. 60 | 39. 99 |
| 1938 | 39. 64 | |
| 1939 | 40. 58 | |
| 1940 | 40. 47 | |
| 1941 | 45. 74 | 36. 42 |
| 1942 | 29. 50 | |
| 1943 | 29. 97 | |

The decline in the petitioner's loss ratio in 1942 and 1943, in relation to previous years, was a direct consequence of war conditions then existing in this country. Wartime restrictions on speed and the use of automobiles, coupled with gasoline rationing, so far reduced the exposure on automobile business that accident frequency dropped substantially. Accidents and claims bear a close relationship to the number of cars on the road and the number of miles they are driven, a good index to which is gasoline consumption. In the years 1936 to 1943, inclusive, the highway use, in thousands of gallons, of motor fuel in the United States, and in the three States in which the petitioner wrote most of its business, was as follows:

| Year | United States | California | Oregon | Washington |
|---|---|---|---|---|
| 1936 | 18,099,138 | 1,473,005 | 192,897 | 292,985 |
| 1937 | 19,455,454 | 1,571,945 | 201,728 | 309,441 |
| 1938 | 19,611,643 | 1,584,252 | 203,685 | 314,553 |
| 1939 | 20,714,352 | 1,688,317 | 218,373 | 326,196 |
| 1940 | 22,001,356 | 1,766,144 | 235,787 | 356,828 |
| 1941 | 24,192,397 | 1,991,690 | 266,823 | 395,111 |
| 1942 | 19,939,887 | 1,700,434 | 231,315 | 356,928 |
| 1943 | 16,004,250 | 1,438,783 | 197,603 | 306,608 |

Among the general casualty insurance companies, underwriting income in 1942 and 1943 increased substantially over underwriting income in 1941 because of the favorable loss ratios occasioned by the war conditions. As a result of these wartime restrictions the loss experience on 1942 and 1943 business was substantially below the assumed percentage (60 per cent of earned premiums on the last 3 policy years) on which loss reserves were set up under statutory requirements. The petitioner's increase in income in the years 1942 and 1943 followed the general trend of other casualty insurance companies. Although casualty insurance companies inaugurated rate cuts and changed their whole rating schedule to reflect exposure on the basis of the type of gasoline ration card, it took approximately a year for the full effect of the rate cut to be reflected in earned premiums.

There were located in Seattle, Washington, two other automobile casualty insurance companies which sold insurance primarily in the Pacific coast area and which were in other material ways comparable to the petitioner. In the following tabulation the net income of such companies for the year 1939 is represented by the figure 100 and the figures for the other years represent the percentage which the income of such other years bore to the income of the year 1939. For purposes of comparison the same type of computation is set forth with regard to the petitioner:

| Year | Two comparable companies | Petitioner |
|------|--------------------------|------------|
| 1936 | 72.7 | 124.2 |
| 1937 | 95.2 | 61.2 |
| 1938 | 56.4 | 140.2 |
| 1939 | 100.0 | 100.0 |
| 1940 | 137.3 | 71.1 |
| 1941 | 238.8 | 160.9 |

For the years 1940 and 1941 the petitioner had no excess profits net income after allowance for excess profits credits. For the year 1944 it had no adjusted excess profits net income after applying a net loss carryback from 1946. For the year 1945 deductions from total income resulted in losses both with respect to net income and excess profits net income before the allowance of any net operating loss carryback. The petitioner's income and taxes for the years in question, 1942 and 1943, were determined by the respondent as follows:

| | *1942* | *1943* |
|---|---|---|
| Net income | $505,104.71 | $571,844.64 |
| Excess profits net income | 490,631.25 | 558,248.09 |
| Exemption and credit | 123,359.95 | 123,359.95 |
| Adjusted E. P. net income before loss carryback | 335,352.28 | 434,888.14 |
| Carryback loss from 1945 | | 58,636.54 |
| Adjusted E. P. net income after loss carryback | 335,352.28 | 376,251.60 |
| Unused E. P. carryback credits | 189,338.61 | 204,903.79 |
| Final adjusted E. P. net income | 146,013.67 | 171,347.81 |
| Tax liability as finally determined: | | |
| Excess profits tax | 131,412.30 | 150,866.18 |
| Income tax | 133,988.52 | 124,983.76 |

The aggregate of the petitioner's base period excess profits net income was $373,477.30 and the arithmetical average thereof was $93,-369.32. Its average base period net income computed under section 713 (f) of the Internal Revenue Code of 1939 was $124,589.42, which was $31,220.10 in excess of the arithmetical average. For each of the years 1940 to 1943, inclusive, the petitioner's excess profits credit was claimed and allowed in the amount of $118,359.95 (95 per cent of the average base period net income computed under section 713 (f)).

### Loss Reserves.

On its books and records and in the preparation of the convention forms filed with its income tax returns, upon the basis of which the petitioner's tax liability was computed, the petitioner carried loss reserves representing the amounts estimated to be necessary to pay claims outstanding as of the end of each year. The amounts ultimately paid on such claims differed from the amounts set up in the

reserves. The following tabulation shows the amounts of such reserves as of December 31 of each of the years 1935 to 1939, inclusive, and the amounts (determined at the close of 1945) to have been paid or necessary to be paid to satisfy the claims represented in such reserves:

| Year | Loss reserves | Amounts paid |
|------|--------------:|-------------:|
| 1935 | $326,860.43 | $285,943.77 |
| 1936 | 266,602.56 | 285,752.82 |
| 1937 | 317,939.25 | 343,229.01 |
| 1938 | 312,061.91 | 289,218.04 |
| 1939 | 439,650.85 | 376,909.72 |

If the net income for the base period were computed by using the actual amounts paid, rather than the amounts set up in the reserves, the result would be to increase the aggregate of the base period net income from $373,477.30 to $395,292.77, an increase of $21,815.47.

### Ultimate Finding of Fact.

The petitioner's average base period net income, as computed under section 713 (f) of the Internal Revenue Code of 1939, is not an inadequate standard of normal earnings.

#### OPINION.

The petitioner seeks recovery of the full amount of excess profits taxes paid for the years 1942 and 1943, in the respective amounts of $131,412.30 and $150,866.18. It claims that under section 722 (a) of the Internal Revenue Code of 1939,[3] it is entitled, in determining its

---

[3] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the

excess profits credit, to use a constructive average base period net income in lieu of its average base period net income since it is alleged it comes within the provisions of section 722 (b) (4) and (5).

The petitioner's principal claim for relief is made under section 722 (b) (4) on the alleged ground that it commenced business immediately prior to the base period and that as a consequence thereof its average base period net income is an inadequate standard of normal earnings.

The petitioner actually commenced business in 1928 and does not contend that it literally commenced business immediately prior to the base period. We have held that the commencement or change of character of business, as shortly before the base period as 1933 or 1934, did not occur immediately prior to that period. See *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220, 1231; *Acme Breweries*, 14 T. C. 1034, 1055; *A. B. Frank Co.*, 19 T. C. 174, 182; *West Flagler Amusement Co.*, 21 T. C. 486, 502; *Huttig Sash & Door Co.*, 25 T. C. 550, 570; *Seggerman Nixon Corporation*, 26 T. C. 442, 451. However, the petitioner does contend that it *should be considered* as having commenced business immediately prior to the base period, placing its reliance upon the provisions of section 35.722–3 of Regulations 112.[4]

The evidence presented, including the testimony of an eminent authority in the casualty insurance field, establishes, and we have found as a fact, that generally in the case of a new and rapidly growing casualty insurance company relatively small earnings or even losses in underwriting income will result for a period of approximately 10 years, due to the method of reporting income which is imposed upon casualty companies, which requires that a large portion of premiums

---

change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. * * *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

[4] Regs. 112, sec. 35.722–3.

No arbitrary temporal limitations can be provided to circumscribe the concept of "immediately prior to the base period" for the purposes of section 722 (b) (4) in the case of a business commenced or changed in character at such time. Nor does the fact that a taxpayer has commenced business or changed the character of its business within one or two years prior to the base period necessarily establish eligibility for relief under section 722 (b) (4). Generally, business experiences a time lag between the time that new operations are commenced, reflecting either the starting of a new business or of a business essentially different in character from an old business, and the attainment of a normal earning level. If all or a portion of this time lag occurs during the base period, the earnings during such period cannot be said to represent normal average earnings.

Generally, the commencement of business or the change in character of a business will be deemed to have occurred immediately prior to the base period if under normal conditions the normal earning level of a business so commenced or changed would not be realized until some time during the base period and would be principally and directly related to such commencement or change. * * *

must be segregated into an unearned premium reserve while deduction of current operating expenses cannot be deferred. The petitioner claims that its experience followed the general pattern of new casualty insurance companies and that as a consequence its normal level of operations and earnings was not reached by the end of the base period. It is argued, therefore, that under the regulations the petitioner must be deemed to have commenced business immediately prior to the base period despite the fact that it actually commenced business 8 years prior thereto.

We have given careful consideration to this contention of the petitioner based upon the regulations, but cannot conclude that the petitioner did not reach its normal level of earnings attributable to the commencement of its business prior to the beginning of the base period. See *West Flagler Amusement Co., supra.*

In the first place, the experience of the petitioner did not follow that of new casualty insurance companies generally. At the time of its creation as a subsidiary of the Northwestern Mutual Fire Association that company transferred to the petitioner a considerable volume of renewal insurance which produced a business growth of the petitioner in excess of what a new insurance company could ordinarily attain. Throughout the years the parent furnished executive and administrative personnel services and use of property at an agreed percentage of the petitioner's written premiums. The parent assumed the production, underwriting, accounting, and management expenses, with certain exceptions. The petitioner, therefore, had a low administrative factor and was hence in a more favorable position with respect to profits than the ordinary new casualty insurance company.

The evidence shows that despite the requirements of maintaining unearned premium reserves, the petitioner showed underwriting profits in each year, except two, from the date of its organization throughout the base period. Due to the fact that the petitioner had investment and other income, it has shown substantial net income for each year of its existence through the years in question, 1942 and 1943. From 1928 through 1935, with the exception of 2 years, it showed a consistent increase in net income. For the base period years, 1936 to 1939, its net income indicates that it had reached a fairly constant level, the net income for those years being, respectively, approximately $112,000, $55,000, $127,000, and $90,000. While it is true that in 1942 and 1943 its net income amounted to approximately $505,000 and $572,000, respectively, the evidence shows that this increase was due, at least in large part, to favorable loss ratios experienced by the petitioner as well as other casualty insurance companies occasioned by war conditions. The petitioner's ratio of losses incurred to net premiums

earned in 1942 and 1943 dropped sharply as compared to such ratio of prior years.

As shown in the tabulation contained in our Findings of Fact, the petitioner enjoyed a more favorable earnings record for the years 1936, 1937, and 1938, as compared with its earnings in 1939, than did two other automobile casualty insurance companies located in the same area and which were in other material ways comparable to the petitioner.

The petitioner introduced into evidence certain statistics, compiled by the above-mentioned insurance authority, showing that 95 casualty insurance companies in the aggregate paid out as Federal taxes a much lower proportion of their operating gains than did the petitioner in 1942 and 1943. The petitioner apparently submitted these statistics as evidence to show that its average base period net income is an inadequate standard of normal earnings. We do not think this necessarily follows. Many factors might enter into such a calculation and show variations between various companies. For example, some companies computed their excess profits credit on the basis of invested capital. We note that the two companies which we have referred to above as being comparable to the petitioner in operations in the Pacific coast area show widely different proportions, one of them showing a proportion quite similar to that of the petitioner, and the other showing a proportion more nearly approaching that of the industry in general. We find these statistics of no assistance in determining whether the base period net income of the petitioner represents an "inadequate standard of normal earnings" which must be shown if relief is to be allowed.

Based upon the whole record we have concluded, and found as a fact, that the petitioner's average base period net income, computed under the growth formula provided for in section 713 (f), is not an inadequate standard of normal earnings within the meaning of section 722. It follows that there was no time lag between the commencement of business and the attainment of a normal earnings level, within the meaning of the regulations, extending into the base period which would justify treating the petitioner as having commenced business immediately prior to the base period for purposes of applying the 2-year push-back rule.

It is true, as shown by the evidence and as set forth in our Findings of Fact, that the petitioner's business continued to grow throughout the base period. However, the fact of continued growth throughout the base period is not in itself a ground for relief under section 722. This factor is taken into account in the computation of the average base period net income under section 713 (f).

In view of the foregoing, we hold that the petitioner does not come within the provisions of section 722 (b) (4).

The petitioner also contends that inaccuracy of its loss reserves in the base period, as indicated by subsequent developments, is a factor which produced an inadequate standard of normal earnings during the base period, within the meaning of section 722 (b) (5). Its position is that in computing average base period net income the amount of actual losses, as later determined, should be taken into account rather than the amount of the reserves, which would increase income for that period by the amount of $21,815.47.

The problem as we see it is to determine whether the deduction of reserves for losses, rather than the amounts subsequently developed as representing actual losses, is a factor "resulting in an inadequate standard of normal earnings." Sec. 722 (b) (5). If the deductions for loss reserves were made in accordance with the petitioner's usual method of computing and reporting income then such deductions cannot be said to result in an inadequate standard of normal earnings. In *Clinton Carpet Co.*, 14 T. C. 581, the taxpayer, which had properly taken deductions for amortization of a contract during the base period, sought relief under section 722 (b) (5) by eliminating such deductions. In denying the claim we said (p. 585):

The taxpayer, during the base period and during its entire existence prior thereto, had known no other standard of earnings than its net income after subtracting the deduction in question. The deduction was neither unusual nor peculiar in the experience of the petitioner. Cf. *Philadelphia, Germantown & Norristown Railroad Co.*, 6 T. C. 789; sec. 722 (b) (1). The normal earnings from the operation of the business during each of those years were the earnings after deducting a proportionate part of the cost of the contract, without which there would have been no earnings for the year. The net earnings, after deducting other deductible items but before or without deducting the amount representing a part of the cost of the contract allocable to those years, can not be regarded as the normal earnings of the base period. * * *

The rule of that case is the one to be applied here. This petitioner had known no standard of earnings other than the amounts arrived at by deducting loss reserves. Such deductions were neither unusual nor peculiar in the experience of either the petitioner or other stock casualty insurance companies. To allow deductions, in computing the base period net income, in the amounts of the losses ultimately determined, rather than reserves therefor, would be inconsistent with the determination of what constituted normal earnings during the base period. The statute forbids the use of any factor which would be inconsistent with the principles underlying subsection (b) of section 722. A chief principle of that subsection is the determination of whether the taxpayer's "average base period net income is an in-

adequate standard of normal earnings." Certainly, we cannot say that there was such inadequacy where deductions are computed and taken in accordance with the usual, accepted, and required method of accounting and there is no showing of any abnormality which affects the amount of the deductions.

The case of *Southern California Edison Co.*, 19 T. C. 935, relied on by the petitioner, does not support its claim that it is entitled to a reconstruction under the provisions of subsection (b) (5). Subsection (b) (5) was not the basis for relief in that case. In that case we allowed the correction of abnormalities in deductions for depreciation and interest within the framework of the taxpayer's regular method of accounting after determining that it had established the existence of other qualifying factors. In this case, as indicated above, we do not regard the loss reserve deductions as abnormalities in the computation of the petitioner's base period net income and it has not established the existence of any qualifying factor.

In view of the foregoing, the determination of the respondent is approved.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*