WEST FLAGLER AMUSEMENT COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 24598. Promulgated January 19, 1954.

*J. Marvin Haynes, Esq., N. Barr Miller, Esq.,* and *Laurence S. Levenson, Esq.,* for the petitioner.

*William J. Stetter, Esq.,* and *Stafford R. Grady, Esq.,* for the respondent.

488

OPINION.

HARRON, *Judge:* Petitioner contends that its average base period net income is an inadequate standard of normal earnings because, it alleges, it commenced business and changed the character of its business immediately prior to and during the base period within the meaning of section 722 (b) (4) of the Internal Revenue Code. Petitioner claims that it qualifies for relief from excess profits tax under section 722, and that by use of the so-called "push-back" rule, its constructive average base period net income amounts to at least $315,000.

The taxable years involved are the fiscal years ending on September 30 in 1941, 1942, 1943, 1944, and 1945.

The pleadings present questions under sections 722 (a) and 722 (b) (4), only. At the trial of this proceeding, the petitioner abandoned an alternative issue which was raised originally in the petition under sections 722 (b) (5) and 713 (f) (7).

The first question to be decided is whether the petitioner commenced business immediately prior to the base period. The evidence shows that petitioner was organized in 1930, and in that year it leased 20 acres of land upon which it constructed a racing course and the customary spectator facilities. The property was at first rented to lessees who conducted a greyhound racing track. During the 1931–32 and 1932–33 seasons, the property was in the hands of a receiver, but shortly after the close of the 1932–33 season, the receiver was discharged. Starting with the 1933–34 racing season, petitioner has operated its track continuously. The petitioner operated its racing track business during its fiscal year which began on October 1, 1933. Since the petitioner's first base period year began on October 1, 1936, it is evident that the petitioner was engaged in the business of operating a greyhound racing track during 3 fiscal years (from October 1, 1933, to September 30, 1936) before the first fiscal year of its base period. Petitioner did not commence business immediately prior to the base period. See *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220, 1231, wherein it was held that a change in business in 1934 was not "immediately prior to the base period"; *Acme Breweries*, 14 T. C. 1034, 1055, where it was held that a change in the character of business in 1933 was not within the scope of subsection (b) (4); *A. B. Frank Co.*, 19 T. C. 174, 181.

However, petitioner argues that·the meaning of the provision in subsection (b) (4), "immediately prior to the base period," permits consideration of the "time lag" which may be encountered between the commencement of a business and the time when a normal level of

earnings is reached, and that satisfaction of the condition set forth in the statutory provision is not dependent upon the particular year in which a business begins. In advancing this argument, petitioner cites section 35.722–3 (*d*) of Regulations 112 [1] which is quoted in the margin. Petitioner contends, in particular, that if its business was not fully developed and its earnings had not reached their full normal level prior to the base period, then it qualifies under the "commencement of business" rule in subsection (b) (4). Petitioner contends, further, that it had not reached its full normal earning level even by the end of the base period. Petitioner, under this issue, relies heavily upon *Del Mar Turf Club*, 16 T. C. 749.

We have considered petitioner's contentions having due regard for the regulation cited, and, also, for the further amplification of the regulation in Bulletin on Section 722 of the Internal Revenue Code issued by the Commissioner on November 1, 1944. [2] But upon consideration of the entire record in this proceeding we cannot sustain petitioner's contentions. The evidence leads us to conclude that petitioner had established its business in the greyhound racing industry of greater Miami by the beginning of its base period. Certain facts should be brought forward which bear upon our conclusion. It has been stipulated that daylight greyhound racing began in the Miami area in 1924, and evening racing began in 1926. At some time between 1926 and 1928, the Biscayne Kennel Club began the operations of its track; in 1928 the Miami Beach Kennel Club began operating its track; petitioner's lessees began operation of its track in 1930, and petitioner took over operations in 1933; and Hollywood started

---

[1] Regs. 112, sec. 35.722–3 (*d*).

(*d*), *Commencement or change in character of business.—* * * *

No arbitrary temporal limitations can be provided to circumscribe the concept of "immediately prior to the base period" for the purposes of section 722 (b) (4) in the case of a business commenced or changed in character at such time. Nor does the fact that a taxpayer has commenced business or changed the character of its business within one or two years prior to the base period necessarily establish eligibility for relief under section 722 (b) (4). Generally, business experiences a time lag between the time that new operations are commenced, reflecting either the starting of a new business or of a business essentially different in character from an old business, and the attainment of a normal earning level. If all or a portion of this time lag occurs during the base period, the earnings during such period cannot be said to represent normal average earnings.

Generally, the commencement of business or the change in character of a business will be deemed to have occurred immediately prior to the base period if under normal conditions the normal earning level of a business so commenced or changed would not be realized until some time during the base period and would be principally and directly related to such commencement or change.

[2] Bulletin on Section 722, p. 32: * * * It is the causal relationship between the commencement or change and the inadequacy of the base period earnings which is important, and not the mere length of time prior to the beginning of the base period that the event occurred. Thus, the commencement or change will generally be considered to have occurred immediately prior to the base period if the normal level of earnings attributable to the commencement or change would not be reached until after the beginning of the base period. Conversely, if the period of initial development ordinarily required by a business to perfect its internal operations and establish its position in the industry had been completed by the beginning of the base period, the commencement or change in character will not be considered to have occurred immediately prior to the base period.

its operations in 1934. Greyhound racing was illegal until 1931. Its legalization is some indication that, as a business, it gained a strong enough foothold before 1931 to survive the period of its illegal existence. But, aside from such inference, we are impressed by the indisputable fact that during the 4 racing seasons beginning in 1932 up to the 1936 season, the petitioner, Miami Beach, and Biscayne, all attained a normal level of operations as is shown by the table set forth in the Findings of Fact which shows attendance and mutuel play. Petitioner's record of attendance and mutuel play before its base period, if not better than that of Biscayne, compared favorably, as it also did with Miami Beach.

From all of the evidence before us, we have found that petitioner's initial period of developing its racing track business and of establishing itself in the greyhound racing business of the Miami area was completed by the beginning of the base period, that the normal level of earnings attributable to the commencement of its business was reached by the beginning of the base period, and that it did not commence its business immediately prior to the base period within the meaning of section 722 (b) (4).

*Del Mar Turf Club, supra,* is distinguishable upon its particular facts. In that case, the taxpayer commenced business in 1937, during the base period, and the evidence established that "it did not reach by the end of the base period the earning level that would have been reached by the end of the base period if the business had commenced in 1935 instead of 1937." We cannot reach that conclusion in this case. Rather, we have found, upon the entire record, that petitioner's earnings attained a level during the base period which would not have been greater if petitioner had commenced the operation of its business at some time before the time in 1933 when such operations began.

*Victory Glass Co.*, 17 T. C. 381, 387, also is distinguishable upon its facts. In that case, the taxpayer, also, began business in 1937, during the base period.

Petitioner contends, further, that it changed the character of its business immediately prior to the base period. It attributes the alleged change of character to the installation of electrically illuminated glass starting boxes, the erection of a "detail" board, the practice of posting immediately odds and the amounts of wagering on the board, the use of "lock-out" kennels before races, and the inauguration of stake races. Petitioner asserts that these things constituted operating changes and that they brought about a large increase in parimutuel wagering and in net income. Petitioner argues, in connection with this contention, that when it commenced to operate its track in 1933, the public lacked confidence in the integrity of greyhound

racing operations, and suspected track operators of engaging in questionable practices.

The evidence does not satisfy us that such attitude existed in the minds of the public to such a degree that the items relied upon by petitioner constituted making a change in the character of its business. Furthermore, nothing in the record before us, establishes that the precise items relied upon—starting boxes, odds board, stake races, and so forth—were not essentially part of the character of the greyhound racing business. The items listed above were improvements as well as part and parcel of the business. Regarded as improvements, they served to make petitioner's operations better, more attractive, and more stimulating. But they were not of such substantial character and importance as to constitute changes in operation which brought about a change in the character of the business within subsection (b) (4). See Regs. 112, sec. 35.722–3 (d); *Wisconsin Farmer Co.*, 14 T. C. 1021, 1028; *Farmers Creamery Co. of Fredericksburg, Va.*, 18 T. C. 241, 250–254; *Studio Theatre Inc.*, 18 T. C. 548, 569. We do not understand petitioner to mean that *it* had been guilty of questionable practices before it put in glass starting boxes, "lock-out" kennels, odds boards, and so forth, and that it thereby changed the "character" of its business. It is held that petitioner did not change the character of its business immediately prior to the base period.

Petitioner argues with more force that during the base period it made changes in the operation and capacity of its business which constitute a change in the character of its business. In support of this contention, petitioner asserts that the remodeling of the grandstand in 1937, the remodeling of the betting shed, the installation of 18 additional betting windows, and the arrangement of the patio represented changes in capacity; and that the installation of the heating plant in the grandstand in 1939, the installation of the electrically operated photofinish camera in 1938 and of the electrically operated odds board, and the adoption of a new system of making payments of nightly purses which brought about savings in petitioner's expenses were changes in the operation of the business. Petitioner contends that all of these items brought about substantial increases in its level of earnings in the base period.

The record in this case is fairly lengthy and includes detailed schedules. We have carefully examined all of the record. We emerge from all of the analysis of all of the evidence unable to find that the changes, which give petitioner the grounds for its claim that it qualifies for excess profits tax relief under section 722 (b) (4), directly resulted in an increase of normal earnings which is not adequately reflected by its average base period net income. We pointed

out in *Wisconsin Farmer Co.*, *supra*, p. 1029, that for the purpose of section 722 (b) (4), a change in the operation of a business must be one

that has such a definite and far-reaching effect upon the taxpayer's earning capacity that its actual base period earnings no longer constitute an adequate standard of normal earnings and that results in the tax imposed on that basis being excessive and discriminatory. But this does not mean that a routine change or one which may reasonably be expected to come about in the course of normal business operations meets the test of the statute.

On the whole, we must conclude that the items relied upon were improvements and phases in the operation of the racing track which were reasonably expected to be made in the course of normal and good business operations. The "changes" in question were not great enough to create a change in the character of business within the meaning of subsection (b) (4), whether considered separately or collectively. We reach that conclusion after considering the circumstances preceding and following the "changes." The petitioner relies heavily, in its contentions, upon all of the improvements which were made in 1937, consisting of remodeling of the grandstand and betting-shed area, the arrangement of a patio, the erection of a wire fence along the course in front of the grandstand, and the addition of 12 betting windows; and upon the improvements made in 1938—the installation of the heating system in the grandstand and of the photofinish camera; and upon the erection in 1939 of the electrically operated odds board. Some of these "changes" are said to constitute major changes in capacity. The validity of the petitioner's theory can be tested by examination of the records of nightly attendance at petitioner's track before and after all of these improvements were made. Such examination does not support petitioner's theory about a "change" in the capacity of its business. For example: Petitioner's grandstand, as originally constructed, provided seats for about 3,000 people. There is nothing in the record to negate the presumption that there were areas on the ground in front of or near the grandstand, along the track, where more than 1,000 spectators could view the races. During the 1935–36 season, before the grandstand and related remodeling work was done, the total attendance at petitioner's track was 179,878. The record does not provide the breakdown of this total to show nightly attendance. But we do have tables showing nightly attendance during the seasons of the base period years, and these show that after the remodeling work was done nightly attendance averaged 2,743 in the 1936–37 season; 2,875 in the 1937–38 season; 3,095 in the 1938–39 season; and 3,577 in the 1939–40 season. Also, that the nightly attendance throughout the base period years ranged from under 2,000 to under or slightly over 3,000 on a large percentage of evenings; that during the three racing seasons in the base period—December of 1937 to April of 1940, follow-

ing the remodeling, comprising 260 nights—there were only 2 nights when attendance reached the very highest level of a little over 8,000 persons; that during the season of 1936–37 before the remodeling, attendance was around 8,000 on only 1 night; that from December 27, 1937, to April 10, 1940, after the remodeling, attendance reached 4,000 and slightly more on only 31 nights; it reached 5,000 and slightly over on only 5 nights; it reached around 6,000 on only 1 night; and it never reached 7,000.  That is to say, after the remodeling, attendance records tended to range around the 2,000 and 3,000 mark, sometimes falling under 2,000.  Petitioner's argument that the increase in the number of wagering windows and spectator areas represented a major increase in capacity amounting to a change in the character of its business breaks down greatly upon the above checking against actual attendance records.  Also, we conclude that the "changes" did not represent any substantial change in operations.

Another test reveals the weakness of petitioner's contention.  Respondent points out correctly, that the evidence shows that a comparison of the 1936–37 season with the 1937–38 season shows that both petitioner and the Miami Beach track "captured" a larger portion of the Miami area greyhound racing patronage in the latter season; the increase for each track was substantially the same, an increase of 1.71 per cent for the petitioner, and an increase of 1.59 per cent for Miami Beach.  Thus it does not appear that the increase in petitioner's business in the 1937–38 season was due primarily to the 1937 remodeling work.  Furthermore, during the 1938–39 season, on the basis of figures for the season's mutuel play, petitioner lost more business than the other three tracks in the area.  Illustrative of this are the following figures for the 1938–39 season:

*Reduction in Mutuel Play*

Petitioner_____ $543, 167
Miami Beach_____ 154, 363
Biscayne_____ 105, 640

The total mutuel play receipts of Hollywood, in the 1938–39 season increased by $155,189 over the preceding season.  Of course, the year 1938 was one of a general business recession.  Nevertheless, petitioner's theory is that its remodeling work was of such importance as to represent a change in the character of its business which profoundly bettered its earnings, and, therefore, it is not amiss to subject the theory to the critical test which the season of 1938–39 affords.  Also, if its theory is sound it would seem to follow that petitioner would have captured a larger portion of the area dog racing patronage after making the "changes" than it actually did.

The "changes" cited by petitioner were essentially those which might normally be made to maintain petitioner's competitive position

in the Miami area dog racing business. We have held that "changes" which merely maintain a taxpayer's competitive position in an industry are not changes in the character of a business within the meaning of section 722 (b) (4). *Avey Drilling Machine Co.*, 16 T. C. 1281, 1298. In that case we said, "A change in character, within the intent of the statute, must be a substantial departure from the preexisting nature of the business [p. 1298]." Our conclusion is, upon all of the evidence, that petitioner did not make "changes" which come within the above rule.

Petitioner's claims fail, also, because it has not established that the "changes" in question resulted in the required increase in its earnings or earnings capacity. Petitioner has not shown that as a direct result of the "changes" the level of normal earnings was increased materially over what such level would have been had the change not been made. Such must be shown in order to obtain the benefit of section 722 (b) (4). See *Roy Campbell, Wise & Wright, Inc.*, 15 T. C. 894, 900. Respondent has introduced in evidence, material showing the upward trend of economic prosperity in Florida, some of which is included in the Findings of Fact. With the upward trend of business activity in Florida during the years 1935–1940, a correlation of the mutuel play at all of the tracks in the Miami area as well as at each of the four tracks, including petitioner's, can be made. We agree with the respondent that with the exception of the season 1938–1939, the upward trend of mutuel play follows the upward trend of general business activity with very close correlation. We must give considerable weight to this factor. It indicates clearly that the upward trend of petitioner's business during the base period can be attributed largely to improved economic conditions. The same apparently can be said for the upward trend of the business of the other three tracks in the Miami area. It follows that the "changes" upon which petitioner relies cannot be said to have been the direct cause of the upward trend of its earnings.

Consideration has been given to *East Texas Motor Freight Lines*, 7 T. C. 579; *7-Up Fort Worth Co.*, 8 T. C. 52; and *Lamar Creamery Co.*, 8 T. C. 928. On their facts, those cases are distinguishable.

It is held that petitioner is not entitled to relief under section 722 (b) (4).

### Respondent's Motion to file Amended Answer.

Respondent belatedly filed a motion asking leave to file an amendment to his answer to make claim for deficiencies in excess profits tax for the taxable years ending in 1941, 1942, and 1945 in the amounts of $48.84, $685.32, and $11,355.91, respectively; and asserting overpayments in excess profits tax for the fiscal years of 1943 and 1944 in

the amounts of $1,528.56 and $924.36, respectively. The motion was filed 7 months after the trial of this proceeding, and 4 months after petitioner's principal brief was filed. If the respondent's motion is granted, the amended answer will raise a new and controverted "standard issue" relating to the correct excess profits credits under section 713 of the Code for the taxable years 1941 through 1945. The respondent's position now is that he made errors in his original determinations of the excess profits credit. As is shown hereinafter, the proposed amended answer is not based upon a statutory notice issued under section 272.

Petitioner objects to the motion. It contends that the motion and the proposed amendment to the answer are untimely; that the proposed amendment to the answer is not, as the respondent contends, merely an amendment to the answer to conform to the proof, but is an effort belatedly to raise a new "standard issue" under section 713 which will require further trial; and that the Court lacks jurisdiction to consider a "standard issue." Petitioner relies upon *Commissioner v. Erie Forge Co.*, 167 F. 2d 71, with respect to untimeliness, and *Mutual Lumber Co.*, 16 T. C. 370, with respect to jurisdiction.

In this proceeding the elements are present upon which we must hold that we lack jurisdiction to consider a "standard issue," if we apply here the views expressed in *Mutual Lumber Co., supra.* The immediate reason for respondent's filing his motion to amend his answer was the decision on November 16, 1951, of *H. Fendrich, Inc. v. Commissioner*, 192 F. 2d 916, and he urges us to follow the *Fendrich* case on the question of jurisdiction and to abandon the views expressed in *Mutual Lumber Co., supra.* But we have recently stated that we are not convinced that we erred in the *Mutual Lumber Co.* case and we followed that case in *Martin Weiner Corp.*, 21 T. C. 470. Accordingly, we conclude that we do not have jurisdiction in this proceeding to consider a "standard issue," and we, therefore, shall deny, by separate order, respondent's motion to file amendment to his answer.

The notice which gave rise to this proceeding was issued pursuant to the provisions of section 732 of the Code and is a notice of disallowance of petitioner's applications for relief under section 722. It is not in part a notice of deficiency issued under section 272; that is to say, it is not a combined notice of deficiency under section 272 and disallowance of relief under section 722. Cf. *Martin Weiner Corp., supra.* In the *Weiner* case the notice was issued in accordance with the provisions of both sections 272 and 732. Prior to the issuance of the notice which gave rise to this proceeding, the petitioner executed a waiver of restrictions provided in section 272 (a), consenting to the assessment and collection of deficiencies in excess profits tax for

the fiscal years of 1941, 1943, 1944, and 1945, and the Commissioner issued a certificate of overassessment of excess profits tax for the fiscal year of 1942. The only issue pleaded and tried in this proceeding is the claim for excess profits tax relief under section 722. That issue is the only one over which we have jurisdiction. The respondent by his motion to amend his answer does substantially what the petitioner did in the *Mutual Lumber Co.* case, *supra*, see page 371, by filing a motion at the hearing of that case. In *Mutual Lumber Co., supra,* p. 373, we said:

no issue arising under the general provisions of Subchapter E could properly be in issue in a case before the Tax Court based upon the denial of a claim for relief under Section 722.

Our jurisdiction in this proceeding is based upon a notice denying relief under section 722, and is given by the provisions of section 732. As we noted in *Mutual Lumber Co., supra,* sections 272 (a) (1) and 732 give separate jurisdictions. Cf. *Ideal Packing Co.,* 9 T. C. 346. We have no jurisdiction to determine the excess profits tax liability under the general provisions of subchapter E, where the notice issued by the Commissioner was one of rejection of petitions for section 722 relief and was issued under section 732. *Mutual Lumber Co., supra,* pp. 372, 373.

We agree with the petitioner that the proposed amendment to the answer is not one to conform to the proof. It is true that the proposed deficiencies and overassessments set forth therein are based upon a stipulation filed in this proceeding but the petitioner entered into the stipulation for reasons which are exclusively related to the issue which was presented by the petition, the claim for relief under section 722. If respondent's motion to amend his answer were granted, a new "standard issue," a disputed issue, arising under section 713, would be raised requiring further trial. That result would represent the untimely presentation of a new issue if we have jurisdiction in this case to consider a "standard issue," which we believe we do not have.

The respondent's motion is untimely and must be denied for that further reason. When this proceeding was tried, 7 months before the filing of the respondent's motion to amend his answer, the parties were in agreement that no "standard issues" had been raised or could be raised. Respondent did not at that time move to amend his answer even though before, and at the beginning of, the trial he had knowledge of all facts which are recited in the proposed amendment to his answer. The trial did not produce any new facts or the evidence which apparently is the basis for the proposed amendment to the answer. Briefs were due *seriatim,* petitioner's principal brief being due first. Petitioner's brief was filed about 4 months before the motion in

question was filed. Respondent has the burden of proof under the issue which would be raised if an amendment to the answer were filed. The proposed amendment to the answer does not set forth the matters which the respondent would have to establish under his burden of proof. The record made upon the trial of this proceeding does not, as far as can be ascertained, contain evidence which obviates the necessity for further trial. The proposed amended answer is not simply an amendment of respondent's pleading to conform to the proof. The motion clearly is untimely. *Commissioner* v. *Erie Forge Co., supra; Simms* v. *Andrew,* 118 F. 2d 803.

Reviewed as to section 722 by the Special Division.

> *Decision will be entered that petitioner is not entitled to relief under section 722.*

MURDOCK, *J.*, dissents on section 722 issue.