YELLOW CAB COMPANY, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32373. Filed February 28, 1961.

*Elton B. Taylor, Esq.*, for the petitioner.
*S. Allen Winborne, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent disallowed petitioner's claims for relief under section 722, for each of its taxable fiscal years ended May 31, 1942, through 1946. Respondent, in connection with his above-mentioned disallowances, also determined deficiencies in excess profits tax against petitioner, as follows:

| Year ended May 31— | Deficiency |
| --- | --- |
| 1943 | $19, 078. 89 |
| 1944 | 16, 002. 04 |
| 1945 | 5, 923. 69 |

The above deficiencies represent the excess profits tax, the payment of which has been deferred under the provisions of section 710 (a) (5) of the 1939 Code.[1]

The issues presented for decision are:

(1) Whether the excess profits tax imposed upon petitioner for each of the taxable years involved was excessive and discriminatory, because:

(a) Its business was depressed in its base period because of temporary economic circumstances unusual in its case, within the meaning of section 722 (b) (2) ; or

(b) It changed the character of its business during its base period; and as a result thereof, its average base period net income (ABPNI) does not reflect the normal operation of its business for the entire base period, within the meaning of section 722 (b) (4) ; or

(c) Its business was affected by any other factor "which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period," within the meaning of section 722 (b) (5).

(2) Whether petitioner has established what would be a fair and just amount representing its normal earnings during the base period, to be used as a constructive average base period net income (CABPNI) in computing its excess profits credit, within the meaning of section 722 (a).

### FINDINGS OF FACT.

Some of the facts were stipulated. The stipulation of facts, together with the exhibits identified therein, is incorporated herein by reference.

The petitioner, Yellow Cab Company, Incorporated, was organized on June 16, 1924, under the laws of North Carolina. For each of

---

[1] All section references herein are to the Internal Revenue Code of 1939, as amended, unless otherwise specified.

the taxable years involved, it filed its Federal income tax return and its excess profits tax return with the collector of internal revenue for the district of North Carolina. Its principal place of business is, and always has been, in Charlotte, North Carolina. Said business has always been the operation of a fleet of taxicabs in Charlotte.

From the time of its organization in 1924 until February 1936, petitioner's principal stockholder was an individual named A. L. Wiley, who also served as its president and treasurer. In addition to his management and operation of the petitioner, Wiley also owned and operated a service station and parking garage at one of the Charlotte hotels. Petitioner's business was conducted from Wiley's service station and garage location, during the time of his management and operation thereof.

In February 1936, petitioner owned seven taxicabs, and these were operated in the following manner. A person desiring a taxicab would place a telephone call to Wiley's service station, where all of the cabs not then in use were stationed. A driver would be sent to pick up the passenger to take him to his destination, and then to return to Wiley's service station. Also, whenever a passenger train arrived at the Charlotte railroad station, Wiley would send whatever cabs were available, in an effort to pick up fares among the incoming passengers. During the time of Wiley's ownership and operation, petitioner did not have any repair facilities of its own; did not have the services of a full-time dispatcher; and had only one telephone line, which served for all of Wiley's business activities. Also at that time, petitioner's drivers were not selected with any significant degree of care.

The gross revenues, executive salaries, and net loss of petitioner for each of the years 1926 through 1935, were as follows (cents omitted):

| Year | Gross revenue | Net profit (or loss) | Executive salaries |
|---|---|---|---|
| 1926 | $29,330 | ($332) | $1,200 |
| 1927 | 23,980 | (978) | 1,200 |
| 1928 | 24,910 | (2,641) | 906 |
| 1929 | 27,857 | (1,098) | (¹) |
| 1930 | 18,673 | (4,007) | 600 |
| 1931 | 20,941 | (5,271) | (¹) |
| 1932 | 19,012 | (6,430) | (¹) |
| 1933 | 17,148 | (1,168) | (¹) |
| 1934 | 14,616 | (950) | (¹) |
| 1935 | 12,690 | (1,924) | (¹) |
| 1936 | 80,164 | 1,761 | 6,260 |

¹ None.

During the period 1930 through 1935, two other taxicab companies operating in Charlotte were the Blue Bird Taxi Company, and Black & White Taxi, Incorporated. In 1935, an individual named R. E. Crump was employed as the manager of the Blue Bird Company, and another of the employees of said company was an individual named

R. D. Kennerly. On September 23, 1935, Crump and Kennerly organized a North Carolina corporation, Bluebird Taxi of Charlotte, Inc. (hereinafter called Bluebird, Inc.), which took over and continued the operation of the taxicab business theretofore carried on by the Blue Bird Company, using 30 taxicabs obtained from said company.

During the latter part of 1935 and early in 1936, Crump and Kennerly conducted negotiations with the above-mentioned Wiley, looking to the purchase of his interest in the petitioner. The negotiations culminated on or about February 25, 1936, when Crump and Kennerly paid certain notes owing on petitioner's taxicabs, and also certain of its open accounts; and as the result of this transaction, Crump and Kennerly acquired all the outstanding capital stock of the petitioner. Under the management of Crump and Kennerly, petitioner continued for a short time to operate the seven taxicabs which it then owned.

Later in 1936, on June 4, Crump and Kennerly organized and acquired all the capital stock of Black & White Cab of Charlotte, Inc. (hereinafter called Black & White of Charlotte); and on the same date said corporation acquired and continued to operate the 10 taxicabs theretofore owned by the above-mentioned Black & White Taxi, Incorporated.

On or prior to June 30, 1936, and at all times subsequent thereto material to this case, Crump and Kennerly possessed the entire equitable ownership in, and exercised complete management and control over, the following corporations: The petitioner; Bluebird, Inc.; Black & White of Charlotte; and C & K Operating Service, Inc. (The last-mentioned corporation is more fully described herein below.)

At the time that Crump and Kennerly acquired the ownership and control of the petitioner, they determined to utilize its nationally known name of "Yellow Cab" in order to build an improved and expanded taxicab business in Charlotte, which they hoped would be more successful than Wiley's operation had been. To this end, the following steps were taken.

1. Petitioner moved its location to a new building which was connected with a parking garage and service station. At the new location a telephone switchboard was installed for the exclusive use of the petitioner, thereby making facilities available to take care of several incoming calls simultaneously. To man the switchboard, dispatchers were hired who provided coverage of the same 24 hours per day.

2. On May 29, 1936, Crump and Kennerly organized the above-mentioned C & K Operating Service, Inc. (hereinafter called "C & K"), which was to operate the garage and service station at petitioner's location and to service and repair the cabs of petitioner and the other two cab companies operated by Crump and Kennerly. C & K accordingly entered into contracts with said taxicab companies owned and operated by Crump and Kennerly, whereby C & K

assumed all liabilities and agreed to pay all operating expenses (exclusive of depreciation) of said taxicab companies, in return for a monthly service charge of 80 percent of the gross revenue of these taxicab companies. Effective March 1, 1937, each of these contracts was amended, to provide for a charge of seven cents per mile of taxicab operation, in lieu of the then prevailing charge of 80 percent of gross revenue.

3. The practice was inaugurated of trading in the taxicabs of Bluebird, Inc., and of Black & White of Charlotte, on new taxicabs. Title to the new cabs was taken in the name of petitioner, and petitioner also operated said new taxicabs. Such transfer of taxicabs from Bluebird, Inc., and Black & White of Charlotte to petitioner took place very rapidly; and by December 1936, petitioner was operating 30 taxicabs; by May 1937, it was operating 44 taxicabs; and from August 1937, throughout the balance of its base period, petitioner operated approximately 50 taxicabs. Neither Bluebird, Inc., nor Black & White of Charlotte owned or operated any taxicabs after April 1938.

4. A cost accounting system (devised by the headquarters of the Yellow Cab System in Chicago, and available to holders of Yellow Cab franchises, such as petitioner) was installed, through the use of which it became possible to have more accurate records of the operation, revenues, and expenses of each taxicab in petitioner's fleet.

5. A program of more careful selection of taxicab drivers was put into effect.

6. Taxicab stands were installed at the railroad station, at a hotel, and at other locations throughout the city of Charlotte, from which the taxicabs of the petitioner could be dispatched to pick up fares, and to which they could return to await further calls.

As of May 31, 1938, the operating contracts between C & K and petitioner, Bluebird, Inc., and Black & White of Charlotte, were terminated; and petitioner acquired all of C & K's assets and assumed its liabilities. Thereafter employees of the petitioner repaired its vehicles.

The taxicabs of petitioner and of the related taxicab companies owned by Crump and Kennerly, were operated the following total miles during the periods shown:

| Period Fiscal year ended May 31— | Total miles operated |
|---|---|
| 1937 | 2,505,146 |
| 1938 | 2,203,972 |
| 1939 | 2,335,803 |
| 1940 | 2,584,670 |

The receipts from taxicab fares by petitioner, Bluebird, Inc., and Black & White of Charlotte, for the years and periods shown, were as follows:

| | Petitioner | Bluebird | Black & White |
|---|---|---|---|
| Calendar year 1936 | $80,164.51 | $79,866.99 | |
| 5-month period, Jan. 1–May 31, 1937 | 67,855.20 | 16,070.15 | |
| Fiscal year ended May 31— | | | |
| 1937 | | | $4,327.29 |
| 1938 | 171,174.38 | 2,872.35 | |
| 1939 | 182,264.69 | (¹) | (¹) |
| 1940 | 202,608.20 | (¹) | (¹) |

¹ None.

The net incomes or net losses of the petitioner, Bluebird, Inc., and Black & White of Charlotte, for the years and periods shown, were as follows:

| | Petitioner | Bluebird | Black & White |
|---|---|---|---|
| Calendar year 1936 | $1,761.71 | $766.61 | |
| 5-month period, Jan. 1–May 31, 1937 | 1,750.30 | (917.66) | |
| Fiscal year ended May 31— | | | |
| 1937 | | | $296.89 |
| 1938 | 1,553.15 | (487.00) | |
| 1939 | 1,042.14 | (¹) | (¹) |
| 1940 | 2,090.66 | (¹) | (¹) |

¹ None.

During the fiscal years ended May 31, 1937 through 1940, Crump and Kennerly each received a salary of a fixed amount each week; and, in each of said years except the one ended May 31, 1938, they each also received a yearend, lump-sum payment of compensation. During each of said years, Crump and Kennerly each received as his total executive compensation one-half of the following amounts:

| Fiscal year ended May 31— | Salaries received from | Paid during year | Paid end of year | Total |
|---|---|---|---|---|
| 1937 | C & K and petitioner | $4,800 | $7,200 | $12,000 |
| 1938 | C & K | 4,770 | None | 4,770 |
| 1939 | Petitioner | 4,330 | 7,670 | 12,000 |
| 1940 | Petitioner | 5,120 | 10,380 | 16,500 |

Petitioner's board of directors passed the following resolution on January 9, 1940, relative to the compensation of its officers:

In accordance with the By-Laws of the Company, the Secretary-Treasurer submitted and explained a financial report covering operations during the past year. It appearing that the business of the Company in the future would be profitable enough to justify additional compensation for the officers, a motion was duly made and unanimously adopted authorizing the President, R. E. Crump, and the Secretary-Treasurer, R. D. Kennerly each to receive $160 per week and in addition thereto, to receive an additional $15,000 each at the end of each fiscal year if, in the opinion of said Crump and Kennerly, the proceeds of the business during such year justified the payment of such additional compensation.

Debits to deposit accounts in banks (i.e., withdrawals from bank accounts) tend to increase or decrease as the volume of business activity in a community or State increases or decreases; and such debits are a generally accepted measure of the level of economic activity. Debits to deposit accounts of banks in Charlotte, during the fiscal years ending May 31, 1938 through 1940, were as follows (in millions of dollars):

| Fiscal year ended May 31— | Debits to deposit accounts |
|---|---|
| 1938 | $669 |
| 1939 | 667 |
| 1940 | 789 |

During the early 1930's and prior to 1933, there appeared in Charlotte, as well as in other cities, a type of taxicab known as a "Dime Cab." Originally, a Dime Cab was apparently a privately owned automobile which the owner also operated as a taxicab after he had paid $25 to secure a license to do so. By 1935, the number of Dime Cabs had increased substantially, in large part due to a practice then being followed by some of the established taxicab concerns in Charlotte, of leasing their cabs to individuals who operated them more or less as independent contractors. The number of Dime Cabs had reached 100 by July 1938.

The method employed by the operators of Dime Cabs to get passenger business was as follows. The operators cruised in the downtown business district and at the terminal points of streetcar and bus routes in the outlying residential areas, soliciting passengers. A Dime Cab would take as many passengers as it could hold, and carry such passengers to their destinations, charging for the transportation furnished at the rate of 10 cents per passenger (hence the name "Dime Cabs").[2] However, a Dime Cab would not take a passenger if he were going to a destination off of the regular streetcar or bus routes, or if said passenger was going to some destination different from that of passengers already in the taxicab. Petitioner's system of operation, on the other hand, and as hereinbefore found, was based on having passengers call in to the switchboard in petitioner's main office, from which point petitioner's dispatcher would send a cab from one of petitioner's stands located throughout the city to pick up the passenger and take him to his destination. Petitioner's cabs did no cruising; and the only "pick-up" business which it was able to get consisted of those persons who might hail one of petitioner's cabs while it was returning to its cabstand, after having let a passenger off at his destination.

As the result of the competition furnished by the Dime Cabs, petitioner was unable to get its proportionate share of the "short-haul" or "pick-up" traffic. Petitioner's officers considered such traffic to be more profitable than the "long-haul" variety, which constituted the bulk of petitioner's business.

When the Dime Cabs first began their operations in Charlotte, the owner-drivers, in order to keep their costs of operation down, did not carry liability insurance. The result was that there came to be a great many claims for personal injury and property damages pending against the owner-drivers, which the latter could not satisfy because they were not able themselves to pay the claims, and they had no insurance. Also, said owner-drivers did not keep their cabs in a

[2] Subsequently during the years 1936 through 1939, the fare charged by the Dime Cabs rose to 25 cents per person. During the same period, petitioner also charged a flat rate, and would carry from one to four passengers to any point in Charlotte for 25 cents.

first-rate state of repair; and by 1935 when their numbers increased, they tended to aggravate the traffic situation in Charlotte.

To meet these conditions, the city council of Charlotte, in October 1933, enacted the first of a series of ordinances aimed at promoting financial responsibility on the part of taxicab operators. Additional ordinances, each repealing the prior one, were enacted in June 1934, October 1935, September 1936, May 1938, and July 1938. The general purport of such ordinances was that each person, firm, or corporation operating taxicabs in Charlotte was compelled to procure and file with the appropriate city official, with respect to each cab operated, a policy of liability insurance, or a surety bond, or a cash deposit—each conditioned for the payment of personal injuries or property damages arising from accidents involving the taxicabs. Also, in July 1935, the city council enacted an ordinance, the provisions of which regulated the taxicab business in considerable detail, both with respect to those who could operate cabs in Charlotte, and also with respect to the operating conditions of the cabs. For example, each taxicab had to pass a safety inspection by the city authorities every 30 days, and each cab driver had to be fingerprinted and be issued a permit by the chief of police. This ordinance was amended in October 1935, to forbid cruising by taxicabs in certain parts of the downtown section and on several of the arterial streets in Charlotte.

Those financial responsibility ordinances which were enacted prior to the passage of the ordinance of July 1938, were not generally effective, by reason of the fact that restraining orders against their enforcement were obtained by the Dime Cab operators. The ordinance passed in July 1938 was enforced however; and its effect, taken in conjunction with the ordinance of July 1935, as amended, was to cut down on the number of the Dime Cabs in the latter part of 1938 and during the years following—although such cabs were not entirely eliminated prior to the close of the petitioner's base period on May 31, 1940. However, during the first 2 weeks of July 1938, preceding the enactment of the last of the above-mentioned financial responsibility ordinances, a substantial number of Dime Cabs were prevented from operating. As the result, petitioner's gross revenues from fares for July 1938, were larger than they were for either July 1937 or July 1939; and also said revenues for July 1938, were the third largest of any month in petitioner's fiscal year beginning June 1, 1938, and ending May 31, 1939, notwithstanding that July was normally the next to the slowest month of the year for the petitioner.

Petitioner's actual arithmetical average base period gross receipts (for the period beginning January 1, 1936, and ending May 31, 1940) were $159,411.36.

Petitioner's actual arithmetical average base period net income for said period was $1,858.56.

The excess profits credit allowed to the petitioner by the respondent, for each of the taxable years, computed under the invested capital credit method provided for in section 714, was as follows:

| Year ended May 31— | Credit allowed |
|---|---|
| 1942 | $3, 555. 44 |
| 1943 | 3, 146. 97 |
| 1944 | 2, 744. 04 |
| 1945 | 2, 709. 99 |
| 1946 | 3, 525. 69 |

*Ultimate Findings.*

Petitioner's business was not depressed during the base period by temporary economic circumstances unusual in its case.

Petitioner's actual level of operations and earnings was normal for it throughout the base period.

OPINION.

1. *Base period depression—Sec. 722(b)(2).*—The question presented under the first issue is whether petitioner's business was depressed during the base period due to temporary economic circumstances unusual in its case, within the meaning of section 722(b)(2). In order for petitioner to qualify for relief under the cited section, it must establish facts which will furnish an affirmative answer to that question. We are of the opinion that it has not done so.

We agree that petitioner's earnings were depressed during the base period. An examination of petitioner's gross revenues from fares for the month of July 1938, during half of which month a substantial number of the Dime Cabs were not operating, is persuasive of the fact that if petitioner had not been faced with competition from Dime Cabs at all other times during its base period, its earnings would have been greater; and hence it follows that its base period earnings were depressed. The fares of July 1938, when Dime Cabs were not being operated, were larger than those either for July 1937, or for July 1939; and they were exceeded in amount (during petitioner's fiscal year ended May 31, 1939) by the fares of only 2 months of said year; whereas in the other years in petitioner's base period, July was next to its slowest month.

But the statute requires that the depression be caused by a *temporary* economic circumstance *unusual* in a taxpayer's case; and we believe that such requirements have not here been met. As indicated in the preceding paragraph, petitioner's depressed earnings were caused by the competition furnished by Dime Cabs. Although com-

petition does fall within the definition of an *economic* circumstance, as contained in the respondent's Bulletin on Section 722 of the Internal Revenue Code,[3] competition in itself is not an *unusual* circumstance within the meaning of section 722(b)(2). *Lamar Creamery Co.*, 8 T.C. 928. Moreover, we believe that the competition of the Dime Cabs, in petitioner's case, was not a *temporary* circumstance. Indeed, Dime Cab competition was present prior to October 1933, when the first financial responsibility ordinance was enacted by the Charlotte city council; and it remained present throughout the base period, and thereafter through at least 1946.

We accordingly hold that petitioner does not qualify for relief under section 722(b)(2).

2. *Changes in character of business—Sec. 722(b)(4)*.[4]—It is at once apparent that petitioner did have a "change in the character of * * * [its] business" as that term is defined in the statute. With the advent of Crump and Kennerly in February 1936, it acquired new management. Also, it installed cabstands throughout the city of Charlotte, abandoned its prior system of operating from one central location, and vastly enlarged its capacity by increasing its fleet from 7 cabs in early 1936, to 50 in 1937. Petitioner contends that, in view of these changes, its actual base period earnings do not reflect normal operations for its entire base period; and that, if the new management had been installed 2 years earlier, its income from fares, and its net income, would have been much higher than they actually were in fact. Accordingly, it seeks the benefit of the 2-year "push-back" rule provided in section 722(b)(4), under which it would be deemed to have made the changes 2 years before it actually did so.

---

[3]                    TEMPORARY ECONOMIC DEPRESSION
  (A) GENERAL RULE.
        *        *        *        *        *        *        *
  The term "economic" includes any event or circumstance, general in its impact or externally caused with respect to a particular taxpayer, which has repercussions on the costs, expenses, selling prices, or volume of sales of * * * an individual taxpayer * * * [p. 16]
[4] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.
  (b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—* * *
        *        *        *        *        *        *
  (4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purpose of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. * * *

Petitioner has not, in our opinion, established facts that support these contentions.

Petitioner argues that, if Crump and Kennerly had acquired control and management of petitioner 2 years earlier than they did, these individuals would have agitated for, and secured the enactment of, city ordinances which would have had the effect of cutting down the number of competing Dime Cabs 2 years earlier than July 1938, when the ultimately effective financial responsibility ordinance was passed. We do not think this is so. The city council had, in response to urging from some quarter, begun enacting financial responsibility ordinances in October 1933; and in July 1935, it also enacted a comprehensive regulatory ordinance. It is true that the earlier financial responsibility ordinances were rendered ineffective, by reason of the fact that restraining orders were obtained against their enforcement.[5] But we do not believe that an effective financial responsibility ordinance could have been obtained any sooner, even if Crump and Kennerly had added their voices to those already seeking municipal regulation of the taxicab business in Charlotte. Indeed, Crump and Kennerly were both connected with an established taxicab business in Charlotte prior to the time they took over the management of petitioner. It can fairly and reasonably be assumed that they were then (though not in petitioner's behalf) pressing the city council to act in the field of taxicab regulation.

It cannot be gainsaid that petitioner's gross receipts and its net income increased under the management of Crump and Kennerly, over the levels which they had reached under the prior management. But such increases must be attributed in large part to the increased number of taxicabs which petitioner operated; and the bulk of this latter increase took place early in petitioner's base period. Petitioner's increased capacity was, we think, adequately reflected throughout petitioner's base period. Moreover, we are convinced from our consideration of the evidence that, if petitioner's earnings had been greater, its officers, Crump and Kennerly, would have caused the petitioner to pay them larger executive salaries, thus preventing its base period *net* income from increasing. In this connection, see and compare *N. Hess' Sons, Inc.*, 31 T.C. 385, 401, where this Court said:

We are not prepared to make the naive assumption that the hypothetical increase in sales and profits * * * would not have been accompanied by a substantial increase in officers' salaries.

In addition to the above-mentioned factors, respondent's expert witness (an economist named McGregor) testified that he could not

[5] The record does not indicate that the regulatory ordinance of July 1935, was ever rendered ineffective, by restraining orders or otherwise.

find that petitioner had any "true growth" (i.e., growth attributable to the changes in the character of its business) during the last 3 years of the base period, after such changes had been effected. McGregor testified that, if the increase in petitioner's gross receipts of such years were so adjusted as to remove therefrom the increases which were due to improved general business activity as reflected in the increases in bank debits, petitioner would show some growth between 1938 and 1939, but that in the succeeding final year of petitioner's base period (June 1, 1939–May 31, 1940) it would show a decline in growth. We are persuaded by this analytical testimony of the witness McGregor that even if petitioner had made the changes in the character of its business 2 years earlier, it would not have achieved any higher level of earnings than it in fact did achieve by the end of the base period. Cf. *West Flagler Amusement Co.*, 21 T.C. 486, 508.

In the light of the foregoing, we have hereinabove found as a fact, and we here hold, that petitioner's actual level of operations and earnings were normal for it throughout the base period; and it is not entitled to apply the 2-year "push-back" rule to the changes made in its business. We, accordingly, further hold that petitioner does not qualify for relief under section 722(b)(4).

3. "*Other factors*"—*Sec. 722(b)(5)*.—Petitioner has presented no evidence, nor has it made any argument on brief, related to qualification for relief under this section. We, accordingly, deem this issue to have been abandoned. If such issue has not been abandoned, and if petitioner relies upon the claimed base period depression and the change in the character of its business to qualify it for relief under section 722(b)(5), we need only reiterate what we said in *Santee River Hardwood Co.*, 26 T.C. 755, 763 :

It need only be pointed out that, where facts properly applicable to a claim under one of the other subsections of section 722(b) have been found insufficient to support such claim, these same facts cannot be relied upon to support a claim under subsection (b)(5). *Constitution Publishing Co.*, 23 T.C. 19; *Granite Construction Co.*, 19 T.C. 163, 173; *Clermont Groves, Inc.*, 17 T.C. 1616; *George Kemp Real Estate Co.*, 12 T.C. 943.

4. *Constructive average base period net income—Sec. 722(a)*.— In the light of our holdings that petitioner is not entitled to relief under any of the subsections of section 722(b) upon which it relies, we do not reach the question whether it has established a fair and just amount representing its normal base period earnings, for use as a constructive average base period net income.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*